1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JILL MCGEE, et al.,                          No. 1:18-cv-00768-NONE-SAB

12                    Plaintiffs,

13        v.                                       ORDER GRANTING DEFENDANTS'
                                                   MOTIONS FOR SUMMARY JUDGMENT
14   POVERELLO HOUSE, et al.,
                                                   (Doc. Nos. 55, 56, 57, 58)
15                    Defendants.

16

17          Plaintiffs Jill McGee, Lydia Carranza, Tracey Stroud, and Sharon Wade filed this lawsuit

18   in the Fresno County Superior Court against defendants Poverello House and Naomi's House,

19   and the case was subsequently removed to this federal court.  (Doc. No. 1.)[1]  Plaintiffs were, at

20   least at the time their complaint was filed, homeless women who sought shelter at defendants'

21   facilities.  Their complaint alleges that defendants violated plaintiffs' rights when a transgender

22   person was permitted to use the same facilities as plaintiffs.  Plaintiffs assert claims for:

23   (1) negligent infliction of emotional distress ("NIED") and negligence per se; (2) violation of the

24   Fair Employment and Housing Act, California Government Code § 12955 *et seq.* ("FEHA");

25   (3) intrusion into private affairs; (4) and violation of the Federal Fair Housing Act ("FHA"),

26   /////

---

[1] Nine plaintiffs originally filed this action.  Four plaintiffs remain after five plaintiffs were
voluntarily dismissed from the action.  (Doc. Nos. 24, 44.)

1

42 U.S.C. § 3601 *et seq.* (Doc No. 1 at 10–14.)[2] Currently pending before the court are defendants' motions for summary judgment as to all remaining plaintiffs and claims. (Doc. Nos. 55–58.)[3] For the reasons explained below, the court will grant defendants' motions in their entirety.

## FACTUAL BACKGROUND

Defendants moved for summary judgment as to all plaintiffs, accompanied by a separate statement of undisputed facts for each plaintiff. In opposing summary judgment, each plaintiff filed her own statement of undisputed facts. The factual background section below is drawn from all of these sets of statements of undisputed facts. (*See* Doc. Nos. 63-1 (Defendants' Statement of Facts and Plaintiff Carranza's Responses, "DSF-Carranza"), 64-1 (Defendants' Statement of Facts and Plaintiff McGee's Responses, "DSF-McGee"), 65-1 (Defendants' Statement of Facts and Plaintiff Stroud's Responses, "DSF-Stroud"), 66-1 (Defendants' Statement of Facts and Plaintiff Wade's Responses, "DSF-Wade"), 70-2 (Plaintiff Carranza's Statement of Facts and Defendants Responses, "PSF-Carranza"), 71-2 (Plaintiff McGee's Statement of Facts and Defendants Responses, "PSF-McGee"), 72-2 (Plaintiff Stroud's Statement of Facts and Defendants Responses, "PSF-Stroud"), 73-2 (Plaintiff Wade's Statement of Facts and Defendants Responses, "PSF-Wade").) For the sake of brevity and unless otherwise indicated, the court will only cite to one statement where appropriate. In providing the factual background below, the

---

[2] Defendants' previous motion for judgment in their favor with respect to plaintiffs' civil rights claims brought under California's Unruh Civil Rights Act, California Civil Code § 51 *et seq.*, was granted with a 21-day deadline for plaintiffs to file an amended complaint. (*See* Doc. No. 46.) Plaintiffs did not amend their complaint. Additionally, the court previously granted the parties' joint stipulation to dismiss plaintiffs' unfair competition claim brought under California Business & Professions Code § 17200 *et seq.* (Doc. No. 45.)

[3] The undersigned apologizes for the excessive delay in the issuance of this order. This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion. That situation, which has continued unabated for over eighteen months now, has left the undersigned presiding over 1300 civil cases and criminal matters involving 735 defendants at last count. Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time. This situation is frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

court is mindful that the evidence before the court on summary judgment must be viewed in a light most favorable to the non-moving party, plaintiffs, for purposes of resolving the pending motions.

**A.       Defendants Poverello House and Naomi's House**

Poverello House is a nonprofit "that serves the homeless, addicted, and those in need by offering daily meal services to men, women, and children, emergency food bags, access to medical and dental care, substance abuse rehabilitation, temporary shelter, and social services for those seeking and hoping to end their homelessness." (DSF-Carranza at ¶ 1.)  The organization "provides its services through various programs on its 'campus' consisting of multiple buildings spanning several acres, and which is open to anyone who entered its campus during daytime hours." (*Id.* at ¶ 2.)  One program offered by Poverello House is Naomi's House, "a 24 bed overnight shelter for single, homeless women." (*Id.* at ¶ 3.)[4]  Naomi's House is a "'Safe Haven' shelter, meaning it served hard-to-reach homeless persons with severe mental illness who are typically unable or too unwell to participate in other housing or supportive services." (*Id.* at ¶ 4.)

Naomi's House is a women-only, first-come, first-serve facility for new clients, "and most nights there is a lottery to stay." (*Id.* at ¶ 5.)  "If a woman received a bed for the night at Naomi's House shelter, she participates in an intake process, which includes verification of homeless and an overview of Naomi's House rules." (*Id.* at ¶ 6.)

"All first time clients and any repeat-clients returning to the shelter after a gap of time must acknowledge, in writing, that they 'understand and agree with' Naomi's House's rules, and that 'breaking' the rules 'may result in denial of services.'" (*Id.* at ¶ 7.)  First, clients may bring certain personal belongings to Naomi's House, however, "cell phones are not permitted" inside. (*Id.* at ¶ 8.)  Second, "violence, misconduct, including yelling, profanity, and/or disrespecting others is not permitted." (*Id.* at ¶ 9.)  Third, "clients are required to shower daily if they wish to stay at Naomi's House." (*Id.* at ¶ 10.)  "Defendants' showers are not private, but rather a locker

---

[4]  The court acknowledges that plaintiffs object to the term "women" as being ambiguous.  While this objection is made to numerous statements of fact that are otherwise undisputed, the court will not note this objection again in this order.

room style building consisting of an open changing area and seven individual shower stalls." (*Id.* at ¶ 11.)  Clients using showers at Naomi's House "enter the shower room in groups of seven, undress, shower, and change into their night clothes." (*Id.* at ¶ 12.)  "Once the women were done, the next group of seven enter." (*Id.*)  "This continues until all of the clients have showered and changed for the night." (*Id.*)  "In addition to the main shower room, there is a bathroom at Naomi's House that contains two single-stall showers, enclosed by standard frosted glass doors, and that are typically reserved for clients with disabilities or, on a case by case basis, clients with other personal issues." (DSF-Stroud at ¶ 13.)[5]

"If a client received a bed, she is allowed to return to Naomi's House the next evening only if she signs into the House by 4:30 P.M. on weekdays, or by 12:45 P.M. or 5:45 P.M. on weekends and holidays." (DSF-Carranza at ¶ 13.)  Clients are not required to pay for defendants' services and they "are free to accept or reject those services at any time." (*Id.* at ¶¶ 14–15.) Clients may stay at Naomi's House for an unlimited number of days, "but if the returning client fails to sign-in at the required time [noted above,] her spot at Naomi's House will be given to another individual in need." (*Id.* at ¶ 34.)  "Clients staying at Naomi's House for consecutive nights are not guaranteed the same bed or even the same room." (*Id.* at ¶ 35.)  "Clients cannot leave any possessions at Naomi's House, or keep the sheets on her bed, or claim or personalize her assigned space in any way." (*Id.* at ¶ 36.)  Plaintiffs partially dispute this fact because, according to plaintiffs, clients were allowed to leave personal items at Naomi's House "at their own risk." (*Id.*)  "Clients are required to check out of Naomi's House at 8:00 A.M., and are not allowed to access a bed or attempt to secure a bed again until [the] check-in" times noted above. (*Id.* at ¶ 37.)

During all times relevant to this lawsuit, defendants "received federal funding including grants from the U.S. Department of Housing and Urban Development ("HUD")." (*Id.* at ¶ 16.) "In accepting money from HUD," defendants must "receive training per HUD rules and annually

---

[5]  This undisputed material fact concerns plaintiff Stroud.  "Plaintiff Stroud was in a wheelchair" and she "primarily showered in the handicapped shower in Naomi's House, as opposed to the larger shower room." (DSF-Stroud at ¶ 22.)

1    acknowledge that they would follow all of HUD's guidelines and regulations[.]"  (*Id.* at ¶ 17.)

2    One of these guidelines includes "HUD's Equal Access Rule pertaining to the placement of and

3    sleeping and bathing accommodations of transgender clients according to the client's personal

4    gender identification."  (*Id.*)

5    **B.     The Alleged Sexual Harassment**

6        "From approximately June 2017 to April 2018, 'D.N.,' a homeless transgender individual

7    who was born a male, but identifies as a female, sought . . . shelter and support" from defendants.

8    (*Id.* at ¶ 18.)  Plaintiffs partially dispute this fact by contending that D.N. is not transgender.  (*Id.*)

9    "Naomi's House allowed D.N. to stay at the shelter and provided all services to her, including use

10   of the shower facilities, in accordance with D.N.'s personal gender identity."  (*Id.* at ¶ 19.)

11   Again, plaintiffs partially dispute this fact by contending that D.N. is not transgender.  (*Id.*)  D.N.

12   and plaintiffs used defendants' services during the same time period.  Plaintiff Carranza used the

13   services "off and on from June 2017 to October 2018."  (*Id.* at ¶ 20.)  Plaintiff McGee used the

14   services "off and on from March 2017 to November 2018."  (DSF-McGee at ¶ 20.)  Plaintiff

15   Wade used the services "from July 2017 to October 2018."  (DSF-Wade at ¶ 20.)  Plaintiff Stroud

16   used the services "off and on from March 23, 2017 to July 20, 2017."  (DSF-Stroud at ¶ 21.)

17       Clients at Naomi's House were supervised by staff "at all times while showering, and staff

18   were always present in the shower area."  (DSF-Carranza at ¶ 21.)  During plaintiffs' and D.N.'s

19   stay at Naomi's House, defendants "had (and still have) policies and procedures in place wherein

20   clients could make verbal or written complaints to staff," and each plaintiff "availed herself of

21   that process."  (*Id.* at ¶ 22; DSF-McGee at ¶ 22; DSF-Wade at ¶ 22; DSF-Stroud at ¶ 24.)  During

22   the plaintiffs' and D.N.'s stay, defendants "had (and still have) policies and procedures in place to

23   respond to and investigate client complaints."  (DSF-Carranza at ¶ 23.)  "If a client complains

24   about sexual harassment, staff is instructed to document everything that the client reports and

25   inform management."  (*Id.* at ¶ 24.)  Plaintiffs partially dispute this fact because, according to

26   them, the entire staff has not "indicated they received training regarding sexual harassment."  (*Id.*)

27   /////

28   /////

1.   Plaintiff Carranza

Plaintiff Carranza submitted a verbal complaint to defendants, dated December 6, 2017, stating that "she 'had a problem with D.N. showering with [her] at the Poverello shower room' because it makes her 'uncomfortable[.]'" (*Id.* at ¶ 25.)[6] Defendants discussed the complaint with plaintiff Carranza and "explained that D.N. must be treated as a woman because she identifies as a woman," however, defendants concluded that plaintiff Carranza's "subjective discomfort around D.N. was not a punishable offense under Naomi's House rules." (*Id.*) Plaintiff Carranza then submitted another verbal complaint, dated January 14, 2017, after she "yelled at D.N. in the bathroom and told staff 'HE is crowding[.]'" (*Id.* at ¶ 26.) After reminding plaintiff Carranza not to call D.N. a "he" and instructing her to speak with staff instead of "yelling at others" in the future, defendants again concluded that plaintiff Carranza's subjective discomfort provided an insufficient basis to punish D.N. (*Id.*) Plaintiff Carranza alleges she made other, undocumented, complaints to defendants but admitted they "listened to all of her complaints and responded . . . by being 'sympathetic' and trying to accommodate her request to have [her] and D.N. placed in different shower groups." (*Id.* at ¶ 27.) Plaintiff believes that defendants' response was insufficient because they "did not take appropriate corrective action to prevent the sexual harassment by D.N." (*Id.*)

Plaintiff Carranza "suffered no economic or physical damages as a result of the alleged events giving rise to this lawsuit." (*Id.* at ¶ 29.) Prior to using defendants' services, plaintiff "had a history of significant life stressors, including homelessness, depression, anxiety, family issues,

---

[6] Plaintiffs object to this statement, and others, as being compound. In making these objections, plaintiffs do not provide any further explanation. (*See, e.g.*, DSF-Carranza at ¶ 26 ("Plaintiff objects on the grounds that it is compound.").) The court will not endeavor to do plaintiffs' job for them. Moreover, plaintiffs are challenging the form of the facts (*i.e.*, compound)—not whether the content of each fact (*e.g.*, plaintiff Carranza's verbal complaint made on December 6, 2017) would be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Therefore, the court will overrule plaintiffs' objections made on the grounds that certain statement are compound. *See, e.g.*, *Galvan v. City of La Habra*, No. SACV 12–2103 JGB (RNBx), 2014 WL 1370747, at *3 (C.D. Cal. Apr. 8, 2014) (Form objections generally, and compound objections specifically, "are challenges to the characterization of the evidence and are improper on a motion for summary judgment.").

her husband being incarcerated, ill, and living away from her in a care home, and she spent time in jail for driving under the influence." (*Id.* at ¶ 30.) Plaintiff Carranza's medical records note her "frustration with her roommates" and other clients at Naomi's House in addition to her stress related to homelessness, but her medical records "do not differentiate between those alleged stressors and [her] other life stressors." (*Id.* at ¶ 31.) At her deposition, plaintiff Carranza admitted that she does not remember why she started seeing a therapist as "[t]here [were] a lot things going on" at that time in her life. (*Id.* at ¶ 32.)

D.N. never made any "sexual advances towards" plaintiff Carranza. (*Id.* at ¶ 38.) "At no time did D.N. ever touch" plaintiff Carranza "in a manner she considered offensive or harassing." (*Id.* at ¶ 39.) "Plaintiff never saw D.N. touch anyone." (*Id.* at ¶ 40.) Further, plaintiff "knew showering was a requirement to stay at the shelter." (*Id.* at ¶ 41.) When she answered the special interrogatories in this case, plaintiff stated "it [was] unknown" what, if any, statutes, ordinances, or regulations defendants violated. (*Id.* at ¶ 33.)

### 2. Plaintiff McGee

Plaintiff McGee submitted a written complaint to defendants on June 18, 2017 claiming that "(1) D.N. said she had [a] 'sexting session' in the House '10 days ago' and had 69 orgasms; (2) D.N. said she is a lesbian, but wants to 'suck a man dry'; (3) D.N. showed [plaintiff McGee] pictures of women in 'sexually posed' positions on her phone while at Naomi's House; and that (4) [plaintiff McGee] 'will not shower while [D.N.] is in the showers,' but listed no reason why other than she 'feel[s] as if it is a game to [D.N.] and [plaintiff McGee's] boundaries mean nothing." (DSF-McGee at ¶ 25.) Although defendants assert they could not verify the claims "because of their age[,]" defendants talked to D.N. and plaintiff McGee, attempted to keep the two separated, and prevented "them from having to shower at the same times." (*Id.*) Plaintiff McGee submitted another complaint on December 16, 2017 stating that it was "not fair" for D.N. to shower with other women at Naomi's House. (*Id.* at ¶ 26.) Thereafter, defendants allowed plaintiff McGee "to shower away from D.N. in another building, in shower reserved for clients with disabilities." (*Id.*) On March 29, 2018, a staff member at Naomi's House reported that "'[D.N.] was just sitting waiting for her turn' to shower when" plaintiff McGee "said that she will

7

1   not even be in the same room with [D.N.] during showers[.]"  (*Id.* at ¶ 27.)  As a result, staff at

2   Naomi's House permitted plaintiff McGee "to shower away from D.N. in a building typically

3   reserved for disabled clients."  (*Id.*)

4        Plaintiff McGee submitted a third complaint, dated March 31, 2018, "stating that she did

5   'not feel comfortable showering' with D.N. 'after all the inappropriate sexual comments made by

6   D.N. to [plaintiff] and others,' and that 'it makes [plaintiff] rush through because [she] do[esn't]

7   want to be undressed and have [D.N.] walk in[.]'"  (*Id.* at ¶ 28.)  Defendants "ultimately

8   determined the complaint lacked specificity as to the date and details of D.N.'s alleged behavior,"

9   and once again found that plaintiff's subjective discomfort was an insufficient basis upon which

10  to find a violation of Naomi House's rules.  (*Id.*)  On April 4, 2018, a staff member's reported that

11  plaintiff refused to take a shower on one occasion, saying that "I'm not showering with him in

12  there," that she would wait until "it" came out of the shower, complaining that it was not "fair"

13  for "it" to be allowed in the shower with other women, and became confrontational with D.N. by

14  "calling her 'it' and telling her 'you're a pervert.'"  (*Id.* at ¶ 29.)  Plaintiff McGee submitted a

15  fourth report on April 5, 2018 in which she:  "(1) made allegations about how D.N. was allegedly

16  treating another client named 'L'; (2) claims 'many women have walked out of Naomi's because

17  of their fear of having a man in the house'; and (3) claimed 'a couple of months ago, [D.N.] told

18  [plaintiff McGee] that [plaintiff's] breasts get a lot [sic] bigger when [she] is stressed out and they

19  get smaller when [she] is not[.]'"  (*Id.* at ¶ 30.)  In response, defendants "had discussions at the

20  staff level and with D.N."  (*Id.*)  Around April 5, 2018, a client named "L" complained about

21  D.N.'s behavior, defendants verified the claims, "and determined that D.N. would not be able to

22  access services and expelled D.N. from Naomi's House for the night."  (*Id.* at ¶ 31.)

23       Plaintiff McGee "suffered no economic or physical damages as a result of the alleged

24  events giving rise to this lawsuit."  (*Id.* at ¶ 32.)  Before using defendants' services, plaintiff "had

25  a history of significant life stressors, including homelessness, physical, sexual, and psychological

26  abuse, depression, anxiety, involuntar[y] detention pursuant to [California] Welfare & Institutions

27  § 5150 hold, two suicide attempts, alcohol abuse, illegal drug use, and violation of various laws."

28  (*Id.* at ¶ 33.)  Plaintiff's medical records "do not differentiate between" her stressors related to the

1  allegations underlying this lawsuit and her "other life stressors." (*Id.* at ¶ 34.)  In her deposition

2  testimony in this case, plaintiff McGee admitted to being "overly stressed" about "issues other

3  than D.N. during her time" using defendants' services. (*Id.* at ¶ 35.)

4      "At no time did D.N. ever touch" plaintiff McGee "in a manner she considered offensive

5  or harassing." (*Id.* at ¶ 41.)  "Plaintiff never saw D.N. touch anyone." (*Id.* at ¶ 42.)  "Plaintiff

6  admits she knew showering was a requirement to stay at the shelter." (*Id.* at ¶ 43.)  In answering

7  a special interrogatory in this case, plaintiff stated "it [was] unknown" what, if any, statutes,

8  ordinances, or regulations defendant violated. (*Id.* at ¶ 33.)

9          3.    <u>Plaintiff Stroud</u>

10     Plaintiff Stroud used a wheelchair "and primarily showered in the handicapped shower in

11  Naomi's House, as opposed to the larger shower room." (DSF-Stroud at ¶ 22.)  On June 7, 2017,

12  plaintiff submitted a verbal complaint to defendants stating that "[D.N.] commented on her body

13  and how they can be together when they leave" Naomi's House. (*Id.* at ¶ 27.)  Thereafter,

14  defendants facilitated a meeting between plaintiff Stroud and D.N., told plaintiff to let them know

15  if any other issues arose with D.N., attempted to keep plaintiff and D.N. separated, and made

16  plaintiff and D.N. shower at different times for the remainder of the time the two were at Naomi's

17  House together. (*Id.*)  On June 16, 2017, plaintiff submitted another complaint to defendants,

18  stating that D.N. "'made a comment of [sexual] behavior' and showed her a picture of D.N. with

19  her 'private tucked' and in 'a blue bra[.]'" (*Id.* at ¶ 28.)  Defendants spoke with D.N., telling her

20  to "stop saying words" making others uncomfortable, but they ultimately concluded that plaintiff

21  Stroud's complaint "lacked specificity as to the date and details of D.N.'s alleged behavior, and

22  whether any of the alleged incidents even occurred at" the shelter. (*Id.*)  Plaintiff made no further

23  complaints to defendants "about D.N. after June 16, 2017." (*Id.* at ¶ 29.)

24     Plaintiff Stroud "suffered no economic or physical damages as a result of the alleged

25  events giving rise to this lawsuit." (*Id.* at ¶ 30.)  Before using defendants' services, plaintiff "had

26  a history of significant life stressors, including . . . physical, sexual, and psychological abuse,

27  illegal drug use, child custody issues, and violation of various laws." (*Id.* at ¶ 31.)  The office at

28  which plaintiff alleges she received counseling for emotional injuries attributed to defendant, "has

no record" of her ever being a patient.  (*Id.* at ¶ 32.)  Last, plaintiff admits "she is not taking any medication as a result of any health conditions" allegedly attributed to defendants.  (*Id.* at ¶ 33.)

"At no time did D.N. ever touch" plaintiff Stroud "in a manner she considered offensive or harassing."  (*Id.* at ¶ 39.)  "Plaintiff never saw D.N. touch anyone."  (*Id.* at ¶ 40.)  Plaintiff disputes this fact because it "misstates the evidence" but provides no citation to such evidence in support of her contention.  (*Id.*)  During her deposition, cited by defendants, plaintiff Stroud was asked whether D.N. ever touched her to which she responded "no."  (Doc. Nos. 57-4 (Declaration of Cynthia Lawrence for Plaintiff Stroud) at ¶ 8, Ex. U; 57-10 at 64 (Deposition of Plaintiff Stroud).)  The follow up question inquired if plaintiff Stroud ever saw D.N. touch "anybody else" to which she responded:  "As far as I ever observed, no."  (*Id.*)  Therefore, there is no genuine issue as to whether plaintiff Stroud saw D.N. touch anyone at Naomi's House—she did not.

Furthermore, plaintiff Stroud "admits she knew showering was a requirement to stay at the shelter."  (*Id.* at ¶ 41.)  When she answered the special interrogatories in this case, plaintiff stated "it [was] unknown" what, if any, statutes, ordinances, or regulations defendant violated.  (*Id.* at ¶ 34.)

4.   Plaintiff Wade

Defendants contend that at her deposition, plaintiff Wade admitted "that she never complained" about D.N. to defendants.  (DSF-Wade at ¶ 25.)  Plaintiff Wade, however, disputes this.  Although she "never personally complained[,]" plaintiff  contends that she "let other women complain about D.N."  because she "did not want to end up on the street."  (*Id.*)  According to her, "staff made it clear that no corrective action would be taken against D.N., and that Naomi's House was not a hotel, and if clients did not like it, they could leave."  (*Id.*)

Plaintiff Wade "suffered no economic or physical damages as a result of the alleged events giving rise to this lawsuit."  (*Id.* at ¶ 26.)  Before using defendants' services, plaintiff "had a long history of significant life stressors, including physical, sexual, and psychological abuse, depression, anxiety, illegal drug use, and violation of various laws."  (*Id.* at ¶ 27.)  Although her medical records mention plaintiff's stress related to her living conditions and homelessness, the

/////

1  records "do not differentiate between those alleged stressors and" plaintiff Stroud's "other life

2  stressors."  (*Id.* at ¶ 28.)

3      "At no time did D.N. ever touch" plaintiff Wade "in a manner she considered offensive or

4  harassing."  (*Id.* at ¶ 34.)  "Plaintiff admits she knew showering was a requirement to stay at the

5  shelter."  (*Id.* at ¶ 35.)  In answering a special interrogatory in this case, plaintiff stated "it [was]

6  unknown" what, if any, statutes, ordinances, or regulations defendant violated.  (*Id.* at ¶ 29.)

7          5.      Other Clients of Naomi's House (But Not Plaintiffs)

8          Plaintiffs have submitted evidence on summary judgment of complaints and incidents

9  involving D.N. and other clients of Naomi's House, none of whom are named plaintiffs in this

10 litigation.

11          On September 27, 2017, D.N. told another client that they were "twins."  (PSF-Carranza

12 at ¶ 32.)  After telling D.N. that their pajamas did not match, D.N. pulled down the side of her

13 pajamas and told the client that their underwear matched.  (*Id.*)  On October 8, 2017, a client

14 complained "that D.N. was showering with the other women."  (*Id.* at ¶ 33.)  On March 27, 2018,

15 "a client complained that D.N. was harassing a number of ladies at the house" in an unspecified

16 manner and said that complaining to Naomi's House would not accomplish anything "because

17 staff would not do anything about it."  (*Id.* at ¶ 34.)  That same day, another client complained

18 "that D.N. was saying they were best friends and that [D.N.] loves her."  (*Id.* at ¶ 35.)

19          A few days later, on March 30, 2018, D.N. made a complaint about another client who

20 made sexually suggestive comments.  (*Id.* at ¶ 36.)  In addition to threatening to obtain a

21 restraining order, D.N. told staff to "tell [the other client] I am straight, I am not going Lesbo for

22 anyone out there ever."  (*Id.*)  Several days after that incident, on April 2, 2018, staff "made a file

23 note" that, in addition to making "inappropriate sexual gestures and comments toward other

24 clients," D.N. came into the shelter with an erection after speaking to another client, "who [D.N.]

25 had developed an infatuation for[.]" (*Id.* at ¶ 37.)  The next day, staff discussed with D.N.

26 concerns regarding her inappropriate behavior.  (*Id.*)  On April 4, 2018, a client reported that D.N.

27 was following her everywhere and was spreading her legs "while wearing very revealing shorts."

28 (*Id.* at ¶ 39.)

On April 5, 2018, a young client made a similar complaint as well.  (*Id.* at ¶ 40.)  The young client complained that D.N. was "gravitating more toward her" since the young client's mother was no longer staying at Naomi's House.  (*Id.* at ¶ 41.)  More specifically, the young client reported that D.N. would peer into her room, D.N. exposed her genitals while the two were at a Walmart store, and D.N. had showed the young client a YouTube video in which D.N. "was shaving [her] legs and rubbing [her]self."  (*Id.*)  D.N. was expelled from Naomi's House for that night, and thereafter "threatened to harm herself and an ambulance was called."  (*Id.* at ¶ 42.)

The next day, on April 6, 2018, D.N. returned to the shelter and a client complained that she did not want to shower with D.N.  (*Id.* at ¶ 43.)  On April 10, 2018, "a client complained that D.N. was following her around and sitting next to her."  (*Id.* at ¶ 44.)  That same client then "recommended that staff needs to watch how D.N. is acting and changing clothes in the shower."  (*Id.* at ¶ 45.)  The following day, on April 11, 2018, "a client complained that D.N. was looking at her between holes in the bathroom stall."  (*Id.* at ¶ 46.)  The client "complained that D.N. was looking at her through cracks while she was using the restroom" and "[t]he client yelled that D.N. was a pervert."  (*Id.* at ¶ 47.)  The client "was visibly upset and tearing up."  (*Id.* at ¶ 48.)  "Other clients reportedly witnessed the incident."  (*Id.*)  The day after, on April 12, 2018, a client—which defendants claim is the same client complaining of similar conduct the day before—reported to Naomi's House that "D.N. was looking at her through small opening in the stall door while the client was using the toilet" and "[t]he client indicated that she did not even wipe herself to get up from the toilet."  (*Id.* at ¶ 49.)  "The client said that she felt violated by D.N. and that D.N. needed to be told to set boundaries."  (*Id.*)

Defendants object to every fact set forth in this subsection.  (*See, e.g.*, PSF-Carranza at ¶¶ 32–49.)  Filing formal objections, defendants argue that all of the evidence cited to support this subsection is irrelevant because it concerns allegations made by other clients of Naomi's House—not any of plaintiffs—and also because the evidence is improper character evidence as to D.N.  (*See* Doc. Nos. 70-3, 71-3, 72-3, 73-3.)  Defendants' argument in this regard is at least slightly misguided.  If "a plaintiff becomes aware of harassing conduct directed at other persons, outside her presence, that conduct may form part of a hostile environment claim and must be considered."

*Christian v. Umpqua Bank*, 984 F.3d 801, 811 (9th Cir. 2020).  Thus, allegations made by other persons can be material to a plaintiff's hostile environment claim.  But here, there is no evidence suggesting that any plaintiff "bec[ame] aware" of the allegations summarized in this subsection during their respective stays at Naomi's House—with one exception.[7]  *See id.*  In support of the allegations contained in this subsection, the only citation to evidence before the court on summary judgment provided by plaintiffs is to the actual complaints made by other clients or defendants' staff notes.  (*See* PSF-Carranza at ¶¶ 32–49; Doc. No. 63-3 (Declaration of Peter N. Kapetan, "Kapetan Decl.") at ¶¶ 12–29.)  Plaintiffs do not cite to evidence indicating that they personally knew of these complaints during their stay at Naomi's House.  For example, plaintiffs do not cite their deposition testimony indicating they had such knowledge.  In short, there is no evidence before the court allowing it to infer that plaintiffs became aware of these complaints during the relevant time period.  Therefore, the court will overrule defendants' objections as to improper character evidence because such evidence, could, in theory, be admissible, but agrees with defendants that the complaints are not material to consideration of plaintiffs' claims as a matter of law.  With one exception, the court will not consider any of the evidence contained in this subsection in ruling on the pending motions.  *See supra* note 7.

**C.     Request for Judicial Notice**

Defendants ask the court to judicially notice six documents filed in this action, (Doc. No. 56-3), including:  (1) the complaint filed by plaintiffs on April 24, 2018; (2) defendants answer to the complaint filed on June 12, 2018; (3) this court's order dated May 8, 2019 directing the Clerk of the Court to terminate two original plaintiffs from the action, (Doc. No. 23); (4) this court's order dated October 3, 2019 directing the Clerk of the Co terminate three original plaintiffs from this action, (Doc. No. 42); (5) this court's order dated October 4, 2019 approving of a joint stipulation of the parties to dismiss one of plaintiffs' original claims, (Doc. No. 43); and (6) this

---

[7]  The court will consider one allegation involving a client who is not a plaintiff in this action. Plaintiff McGee became aware of an incident involving D.N. and a client named "L" and subsequently filed a complaint with Naomi's House on the basis of that alleged incident.  That complaint concerns the allegations summarized in this subsection that occurred on April 5, 2018. Thus, the April 5th incident is relevant to plaintiff McGee's sexual harassment claim only.

court's order dated October 30, 2019[8] granting defendants' motion for judgment on the pleadings and dismissing one of plaintiffs' original claims with leave to amend, (Doc. No. 46.)  The Federal Rules of Evidence provide that a "court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned."  Fed. R. Evid. 201.  Generally, the court "takes judicial notice of its own docket as a matter of course."  *See Ranero v. Cnty. of San Bernardino*, No. CV 16-02655 CBM, 2018 WL 8058373, at *3 (C.D. Cal. Mar. 12, 2018).  "Accordingly, although the request for judicial notice was unnecessary . . . ," defendants' request is granted because it satisfies the elements of Rule 201.  *See id.*

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

---

[8]  Although defendants cite to the docket entry for their own moving papers as the document they seek to be judicially noticed, it appears from the title and date used to identify the document in question that defendants actually seek that judicial notice be taken of the court's decision.  (*See* Doc. No. 56-3 at 2.)

not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 745 (9th Cir. 2010).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

/////

1

**ANALYSIS**

2   Defendants move for summary judgment in their favor on all claims as to all remaining

3 plaintiffs.  Below, the court will discuss the arguments in the order that they appear in defendants'

4 motions.

5 **A.**  **Defendants Obligations Under Federal Law**

6   Homeless shelters receiving federal funding from HUD must comply with certain rules

7 and regulations.  *See* 24 C.F.R § 5.100 *et seq.*  The parties do not dispute that Naomi's House is

8 subject to these rules and regulations.  (DSF-Carranza at ¶¶ 16–17.)  As a result, Naomi's House

9 must provide "[e]qual access to . . . programs, shelters, other buildings and facilities, benefits,

10 services, and accommodations . . . to an individual in accordance with the individual's gender

11 identity[.]"  24 C.F.R. § 5.106(b)(1).  Furthermore, shelters with "shared sleeping quarters" and

12 "shared bathing facilities"—which includes Naomi's House—must place and accommodate an

13 individual "in accordance with the individual's gender identity."  24 C.F.R. § 5.106(c)(1).  Under

14 these rules and regulations, "gender identity" means

15

16

17

18

> the gender with which a person identifies, regardless of the sex assigned to that person at birth and regardless of the person's perceived gender identity.  Perceived gender identity means the gender with which a person is perceived to identify based on that person's appearance, behavior, expression, other gender related characteristics, or sex assigned to the individual at birth or identified in documents.

19 24 C.F.R § 5.100.  Individuals may not be "subjected to intrusive questioning or asked to provide

20 anatomical information or documentary, physical, or medical evidence of the individual's gender

21 identity."  24 C.F.R. § 5.106(b)(3).  At the same time, organizations such as Naomi's House

22 "must take nondiscriminatory steps that may be necessary and appropriate to address privacy

23 concerns raised by residents or occupants and, as needed, update its admissions, occupancy, and

24 operating policies and procedures in accordance with" the preceding subsection regarding

25 providing equal access in accordance with one's gender identity.  24 C.F.R. § 5.106(c)(2).

26   Defendants argue that this "entire lawsuit is specious because it seeks to penalize" them

27 for complying with the above regulations "and treating D.N. with the fairness and dignity these

28 laws guarantee for her."  (Doc. No. 56-1 at 17.)  Put another way, defendants argue that the law

1  *required* them to allow D.N. to stay at Naomi's house. (*Id*. at 16.) Although it is not entirely

2  clear, defendants appear to be suggesting they are entitled to summary judgment as to all of the

3  claims in this case on this ground. Accordingly, the court will briefly address this argument

4  below.

5        Plaintiffs contend that a genuine and material disputed issue of fact exists as to whether

6  D.N. was in fact transgender and therefore whether the actions taken by defendants in this case

7  indeed were required by regulation. (Doc. No. 64 at 7.) In support of this contention, plaintiffs

8  submit the deposition transcript of a transgender woman, "Michelle," who stayed at Naomi's

9  House while D.N. was present. (Kapetan Decl. at ¶ 4, Ex. 2.) At her deposition in this case,

10  Michelle testified "that she did not believe D.N. was a transgender" individual. (PSF-Carranza at

11  ¶ 26 ("Undisputed only to the extent that the witness does not believe D.N. is a transgender

12  woman").)[9] Plaintiffs also submit deposition testimony from two employees of Naomi's House,

13  (Kapetan Decl. at ¶¶ 5–6, Exs. 3–4), who "testified that D.N. does not identify as a transgender

14  female, but rather he identifies as a female," (PSF-Carranza at ¶ 27 (objecting as irrelevant)).

15        Nonetheless, the court concludes that there is not a genuine issue of material fact as to

16  whether D.N. was transgender at the time the events giving rise to this litigation occurred. This

17  conclusion is dictated because it is "the gender with which [D.N.] identifies" that is relevant, not

18  her "perceived gender identity" based on what others think about her "appearance, behavior, . . .

19  [or] other gender related characteristics[.] 24 C.F.R § 5.100. Plaintiffs statement that D.N. is not

20  a "transgender female" and rather, simply "identifies as a female" is confusing, (*see* PSF-

21  Carranza at ¶ 27), but in any event, misses the mark entirely given the definition of "gender

22  identity" under federal law, *see* 24 C.F.R § 5.100 ("the gender with which a person identifies").

23  _____

24  [9] Defendants object to the court's consideration of the Michelle deposition on grounds that her
testimony is irrelevant, lacks foundation, is improper opinion and/or expert testimony, and is

25  inadmissible character evidence as to D.N. (Doc. No. 70-3 at 2–6.) The court overrules
defendants' objections, some of which are redundant of the summary judgment standard. *See,*

26  *e.g.*, *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court
can award summary judgment only when there is no genuine dispute of *material* fact. It cannot

27  rely on irrelevant facts, and thus relevance objections are redundant."). Michelle's opinion as to
whether she believed D.N. was transgender, or not, is irrelevant under federal law for reasons

28  explained in this order.

1   There is no evidence before the court on summary judgment indicating that D.N., herself,

2   identified with any gender other than being a woman.  And defendants accommodated D.N. "in

3   accordance with [that] gender identity."  *See* 24 C.F.R. § 5.106(c)(1).

4          However, the court concludes that there is a genuine issue of material fact as to whether

5   Naomi's House took "nondiscriminatory steps that" were "necessary and appropriate to address

6   privacy concerns raised by residents" of the shelter.  *See* 24 C.F.R. § 5.106(c)(2).  While

7   defendants have put forward credible evidence indicating that they took the complaints filed

8   against D.N. seriously, plaintiffs obviously disagree as to whether the corrective actions taken by

9   Naomi's House were sufficient under the circumstances.  Construing the evidence in a light most

10  favorable to plaintiffs, a jury could reasonably infer from the evidence before the court on

11  summary judgment that Naomi's House could have taken additional steps to address the privacy

12  concerns raised by its clients regarding D.N.'s behavior.  For this reason, the court rejects the

13  proposition that defendants are entitled to summary judgment as to all of the claims in this case

14  simply because the actions taken were to comply with obligations imposed under federal law.

15  Among other things, defendants have not supplied the court with any case law that suggests

16  actions taken to comply with federal regulations are *per se* immunized from the kinds of claims

17  advanced by plaintiffs in this lawsuit.  Even if such authority existed, the disputes of material fact

18  identified above preclude the court from finding on summary judgment that the defendants'

19  actions were undertaken in compliance with applicable federal regulations.  Accordingly, the

20  court will turn to analyze the merits of each of plaintiffs' claims below.

21  **B.      Negligent Infliction of Emotional Distress**

22         Under California law, NIED is not an independent tort but is a type of negligence to which

23  the traditional elements—duty, breach, causation, and damages—apply.  *Marlene F. v. Affiliated*

24  *Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989); *see Burgess v. Superior Ct.*, 2 Cal. 4th

25  1064, 1072–73 (1992). Here, the court's analysis will begin and end with the first element,

26  whether defendants owed plaintiffs any duty under California law.

27         Deciding whether a legal duty exists "is a legal issue that is particularly amenable to

28  resolution on summary judgment."  *Vournas v. Fidelity Nat. Title Ins. Co.*, 73 Cal. App. 4th 668,

18

672 (1999).  Every person has a duty to use ordinary care to prevent others from being injured as a result of their own conduct.  Cal. Civ. Code § 1714.  However, "social policy must at some point intervene to delimit liability" and "policy considerations may dictate that a cause of action should not be sanctioned no matter how foreseeable the risk."  *Parsons v. Crown Disposal Co.*, 15 Cal. 4th 456, 476 (1997).  There is generally no "duty to avoid negligently causing emotional distress to another."  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993).  "[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty."  *Id.* ("Even then, with rare exceptions, a breach of the duty must threaten physical injury . . .").  A legal "duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship."  *Id.*  Plaintiffs argue that defendants had a duty protect them from D.N.'s alleged sexual harassment.  (*See* Doc. No. 64 at 13; *see also* Compl. at ¶¶ 26–28.)  Plaintiffs' theory of NIED is not that defendants directly caused the emotional harm, but that defendants failed to act affirmatively to prevent a third party from inflicting emotional harm on plaintiffs.  However, "there is generally no duty to protect others from the conduct of third parties."  *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 627 (2018).  There are at least two exceptions to this general no-duty-to-protect rule:  first, when a special relationship exists between the defendant and either the plaintiff or the third party; and second, when the defendant undertakes a duty, *i.e.*, assumed a duty.  *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 76 (2019).  A plaintiff seeking to impose an affirmative duty to protect must show that the imposition of a duty is supported by law, even if a special relationship exists "or some other set of circumstances giv[e] rise to an affirmative duty to protect."  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 209 (2021).  Here, plaintiffs must establish that the imposition of an

/////

/////

/////

/////

19

1    affirmative duty to protect is supported by law.  If they cannot, their NIED claims fail.  *See id.*[10]

2         Unburdened by any citation to a California court decision finding a duty based on similar

3    circumstances, plaintiffs simply contend that "it is unfathomable" for defendants to claim they did

4    not owe plaintiffs a duty "[g]iven the array of services provided" by Naomi's House.  (Doc. No.

5    64 at 8.)  The parties' briefing does not characterize plaintiffs' NIED claim as seeking to impose

6    an affirmative duty to protect.  (*See* Doc. Nos. 56-1 at 18; 64 at 8.)  Defendants argue that

7    plaintiffs cannot demonstrate that a duty existed under any of the three standards, *i.e.*, by law,

8    special relationship, or assumption.  It appears that plaintiffs also analyze the duty element using

9    this same framework.  Thus, the court will begin by discussing whether a duty was imposed on

10   defendants by law based on a balancing of the factors articulated by the California Supreme Court

11   in *Rowland v. Christian*, 69 Cal. 2d 108 (1968).  Because the court concludes that consideration

12   of those factors does not weigh in favor of imposing a duty, the court will then briefly explain

13   why a special relationship cannot give rise to a duty in this case.  Last, the court will determine

14   whether defendants assumed a duty in which in which the "emotional condition of the plaintiff[s]

15   [wa]s an object."  *See Potter*, 6 Cal. 4th at 985.

16        California courts consider the so-called *Rowland* factors when determining whether a duty

17   is imposed by law.  *See, e.g.*, *Elsheref v. Applied Materials, Inc.*, 223 Cal. App. 4th 451, 459

18   (2014).  These factors include the

19            "foreseeability of harm to the plaintiff, the degree of certainty that
             the plaintiff suffered injury, the closeness of the connection
20           between the defendant's conduct and the injury suffered, the moral
             blame attached to the defendant's conduct, the policy of preventing
21           future harm, the extent of the burden to the defendant and

22   _____

[10] In *Brown* the court noted two exceptions to the no-duty-to-protect rule, when a person assumes
23   a duty and when a special relationship exists.  11 Cal. 5th at 215.  Although only the latter
     exception was at issue in the case, *Brown* appears to hold more broadly that whenever an
24   exception to the no-duty-to-protect rule applies, the imposition of an affirmative duty to protect
     must still be supported by law.  However, the court in *Brown* did not explicitly discuss situations
25   where a party assumes a duty in which the emotional condition of the plaintiffs is the object.  *See*
     *Potter*, 6 Cal. 4th at 985.  In situations where a party assumes such a specific duty, it is unclear if
26   the imposition of a duty must still be supported by law based on the holding in *Brown*.  Because it
     does not impact resolution of the pending motion, the court will analyze whether defendants
27   assumed an affirmative duty to protect the emotional condition of plaintiffs, irrespective of any
     possible limitation imposed by the California Supreme Court in *Brown*.

28                                          20

> consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Id.* (quoting *Rowland*, 69 Cal. 2d at 113).  In applying the *Rowland* factors, "the question is not whether the specific facts support an exception to the general duty of reasonable care, but 'whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'"  *Makhzoomi v. Sw. Airlines Co.*, 419 F. Supp. 3d 1136, 1160 (N.D. Cal. 2019) (quoting *Vasilenko v. Grace Fam. Church*, 3 Cal. 5th 1077, 1083 (2017)).  "Unlike other elements of negligence—breach, injury, and causation—which are necessarily fact-dependent, the '[a]nalysis of duty occurs at higher level of generality.'"  *Id.*  Courts must

> not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

*Elsheref*, 223 Cal. App. 4th at 459 (quoting *Ballard v. Uribe*, 41 Cal. 3d 564, 572 n.6 (1986)).  Therefore, courts do not necessarily view the record in a light most favorable to the nonmoving party when applying the *Rowland* factors on summary judgment.  *See, e.g.*, *Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1149 n.18 (N.D. Cal. 2014).  Here, consideration of the *Rowland* factors do not support imposing a duty on defendants.  Even viewing the facts in the light most favorable to plaintiffs, as the court must, only one factor weighs in favor of finding a duty, but all other factors do not.

Evaluating the factual circumstances in a light most favorable to plaintiffs, some harm to plaintiffs was likely foreseeable.  Defendants had rules governing behavior likely because, among other reasons, they understood that their clients' existing emotional issues could be exacerbated by a lack of respect and dignity.  (DSF-Carranza at ¶¶ 6–7, 9.)  Furthermore, defendants could have foreseen some harm because they had procedures for clients to make complaints, (DSF-Carranza at ¶ 22), and various clients made complaints against D.N. over the course of several months with increasing frequency, (PSF-Carranza at ¶¶ 32–49).  On the other hand, in making this determination the court is not to focus on the specific facts of this case; instead, it must ask at

a higher level whether defendants' conduct (*i.e.*, not doing more to protect its clients from other clients) "is sufficiently likely to result in the kind of harm experienced" by plaintiffs (*i.e.*, emotional harm). *See Elsheref*, 223 Cal. App. 4th at 459 (citation omitted).  In this regard, plaintiffs have not offered evidence on summary judgment indicating that defendants have, as a general matter and aside from D.N. specifically, failed to prevent inappropriate conduct on the part of clients.  There is no evidence before the court suggesting that the type(s) of negligent conduct and harm alleged in this case was a frequent or even occasional issue at Naomi's House. (*See, e.g.*, PSF-Carranza at ¶¶ 24–25 (undisputed that "Michelle" was a transgender woman who had no problems with plaintiffs "and was well received by the clients").)  Rather, the evidence on summary judgment indicates that this was an issue involving D.N. only.  If plaintiffs showed that defendants regularly failed to protect clients in a similar manner, consideration of the foreseeability factor would undoubtedly weigh heavily in favor of imposing a duty here. Nonetheless, because some harm was likely foreseeable, the court concludes that consideration of this factor weighs to some degree in favor of imposing a duty.

However, "[f]oreseeability of injury . . . is but one factor to be considered in the imposition of the negligence liability" when courts apply the *Rowland* factors.  *See Elsheref*, 223 Cal. App. 4th at 460 (quoting *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 398 (1992)).  Here, consideration of all the other factors does not support imposing a duty on defendants.  First, the degree of certainty of each plaintiffs' injuries is far from certain.  It is undisputed that no plaintiff suffered from any "economic or physical" harm "as a result of the alleged events giving rise to this lawsuit."  (DSF-Carranza at ¶ 29; DSF-McGee at ¶ 32; DSF-Stroud at ¶ 30; DSF-Wade at ¶ 26.)  D.N. never touched any of the plaintiffs in an "offensive or harassing" manner.  (DSF-Carranza at ¶ 39; DSF-McGee at ¶ 41; DSF-Stroud at ¶ 39; DSF-Wade a ¶ 34.)  The only harm at issue in this case is emotional harm.  *See Regents of Univ. of Cal.*, 4 Cal. 5th at 671 (noting that the degree of certainty that harm occurred "may come into play when the plaintiff's claim involves intangible harm, such as emotional distress"); *Kesner v. Superior Ct.*, 1 Cal. 5th 1132, 1148 (2016) (explaining this factor "has been noted primarily, if not exclusively, when the only claimed injury is an intangible harm such as emotional distress").  But even that is speculative

based on the evidence before the court on summary judgment.  *See Burgess*, 2 Cal. 4th at 1073

("[I]n the context of a negligence action, damages may be recovered for *serious* emotional

distress unaccompanied by physical injury." (emphasis added)); *see also Molien v. Kaiser Found.*

*Hosps.*, 27 Cal. 3d 916, 925–27 (1980) (recognizing NIED based only on "serious" emotional

harm but noting the justification for the previous rule requiring physical injury "appear[ed] to be

that it serve[d] as a screening device to minimize a presumed risk of feigned injuries and false

claims").  In this case it is undisputed that the medical records of three of the plaintiffs "do not

differentiate between" stress related to D.N.'s conduct and stress related to each plaintiff's

personal issues unrelated to D.N.  (DSF-Carranza at ¶ 31; DSF-McGee at ¶ 34; DSF-Wade at

¶ 28.)  As to the remaining plaintiff, it is undisputed that the office where she claims to have

sought counseling for her emotional issues as a result of D.N.'s conduct "has no record of [her] as

a patient."  (DSF-Stroud at ¶ 32.)  The evidence on summary judgment in this case is

representative of the types of issues that will arise if the court finds that a duty exists at a more

general level.  While there is some evidence that plaintiffs suffered from *stress* as a result of

D.N.'s alleged harassment, that is the kind of harm that counsels against imposing a duty here.

Second, the closeness of defendants' conduct and the injury suffered is attenuated.  *See,*

*e.g.*, *Modisette v. Apple, Inc.*, 30 Cal. App. 5th 136, 145 (2018) ("In cases where courts have

found a sufficiently close connection to warrant the recognition of a duty of care notwithstanding

the involvement of a third party, the relationship between the defendant's actions and the

resulting harm was much more direct.").  Plaintiffs' theory of this case is not that defendants

"directly put the plaintiffs in danger," but instead, defendants knew of a third party that was

harming plaintiffs and failed to sufficiently remedy the situation under the circumstances.  *See id.*

at 146.

Third, the moral blame of defendants' conduct is minimal.  This is particularly true here

where it is undisputed that defendants made good-faith efforts to comply with federal law

requiring them to accommodate D.N.'s "gender identity"—even if there may be a genuine issue

of disputed fact as to whether defendants took sufficient steps to respect plaintiffs' privacy

interests.  *See, e.g.*, *Trear v. Sills*, 69 Cal. App. 4th 1341, 1355 (1999) ("Granting the premise that

23

1    a patient's symptoms (e.g., an eating disorder) *might* be the result of the suppressed trauma of

2    child molestation (as the Legislature certainly has), there is no moral blame in a therapist seeking

3    to confront it.").  While it is true that defendants had knowledge at some point that D.N. was

4    disturbing other clients, defendants had to balance that interest with not violating federal law.  *See*

5    *id.* (finding that a therapist owed no duty to a patient's father, who alleged that the therapist

6    triggered the patient's false memories of sexual abuse, in part because of the countervailing

7    interest of the therapist's duty to the patient).

8           Fourth, if the court were to impose a legal duty on defendants here, the burden on

9    Naomi's House—a nonprofit organization—and other homeless shelters may have adverse

10    consequences to the community, including the shutting down of such desperately needed shelters.

11    *Cf. Elsheref*, 223 Cal. App. 4th at 460 ("imposing a duty [on employers] toward nonemployee

12    persons saddles the defendant employer with a burden of uncertain but potentially very large

13    scope" (citation omitted)).  Imposing a duty on homeless shelters would place them in the

14    untenable position of having to choose between either defending against lawsuits alleging

15    negligence, on the basis they failed to respect a client's subjective concern regarding transgender

16    individuals or, alternatively, for violating federal law, on the basis they allegedly failed to respect

17    a client's gender identity.[11]  In sum, consideration of the *Rowland* factors does not support

18    imposing liability on defendants.

19           The parties do not cite any California state court case holding that homeless shelters have

20    a duty to its clients.  However, defendants have cited three decisions from other jurisdictions as

21    persuasive authority to support their argument that the court should not impose such a duty in this

22    case.  The first case concerns a homeless shelter's duty to protect the public generally and is thus

23    not directly on point.  In *Rivera v. New York City Health & Hospitals Corporation*, the plaintiff

24    sued a homeless shelter for negligence after he was pushed into an oncoming subway train by an

25    individual who was receiving assistance from the shelter, with the plaintiff claiming among other

26

---

27    [11]  The court is unaware of the availability and cost of any insurance for the type of risk presented

28    in this case and the parties have not presented evidence addressing that issue in connection with
    the pending motion.

1    things that the shelter failed to take steps to protect the public from the perpetrator.  191 F. Supp.

2    2d 412, 415 (S.D.N.Y. 2002).  The district court granted the homeless shelter's motion to dismiss

3    because the complaint failed to allege any facts giving rise to a duty of care to the general public,

4    in part, because the plaintiff did not allege that the shelter "had any ability to control" the

5    perpetrator.  *Id.* at 425.  The other two cases cited by defendants concern a homeless shelter's

6    duty to its own clients and are somewhat more relevant here given the facts in this case.  In

7    *Metropolitan Dade County v. Dubon*, the state appellate court reversed a jury verdict finding a

8    county liable for negligence after a client of a homeless shelter attacked his roommate.  780 So.

9    2d 328, 330 (Fla. Dist. Ct. App. 2001).  The state appellate court reasoned that "[b]ecause the

10   defendants did not have either the right or the ability to control the assailant, they did not owe a

11   duty to the plaintiff."  *Id.*  ("[B]oth the plaintiff and the defendant were absolutely free to come

12   and go as they chose.  Beckham Hall provided valuable services to its homeless residents.  It did

13   not have a common law duty to maintain a vigil over those who sought shelter.").  Finally, in

14   *Henry v. Bi-District Board of Urban Ministry, Incorporated*, the state appellate court affirmed the

15   trial court's grant of summary judgment on a negligence claim brought by a guest of a homeless

16   shelter struck in the head by another guest after balancing "the foreseeability and gravity of the

17   potential harm against the burden imposed in preventing that harm."  54 S.W.3d 287, 289–90

18   (Tenn. Ct. App. 2001) (citation omitted).  The analysis by the courts in *Dubon* and *Henry* support

19   this court's conclusion and its application of certain factors under *Rowland*.  Plaintiffs attempt to

20   discredit the decisions in *Dubon* and *Henry* on the basis that the bodily injuries resulting from

21   physical attacks were less foreseeable and preventable than some degree of emotional harm

22   resulting from sexual harassment.  The court finds plaintiffs' argument in this regard to be

23   unconvincing for three reasons.  Under *Rowland*, foreseeability alone is insufficient basis upon

24   which to find a duty, whether conduct was "preventable" is not a factor (at least not without

25   consideration to the burden it would impose), and courts must consider the degree of certainty

26   that the plaintiff suffered an injury (*e.g.*, emotional harm as opposed to bodily injury) among

27   other factors.  *See Elsheref*, 223 Cal. App. 4th at 459–60.  For all of these reasons, this court

28   concludes that defendants did not owe a duty to plaintiffs under California law.

Next, the court will briefly discuss why defendants did not owe a duty to plaintiffs based on a special relationship. As noted above, a duty can generally be imposed under three separate circumstances (*i.e.*, by law, special relationship, or assumption). *See Potter*, 6 Cal. 4th at 985. However, in *Brown*, the California Supreme Court recently limited the ways in which a duty can be imposed in cases "where defendant did not create the risk that resulted in plaintiff's injuries" or, in other words, cases seeking to impose an affirmative duty to protect. 11 Cal. 5th at 222 n.9. In *Brown*, an Olympic athlete alleged Olympic organizations "acted negligently by failing to take steps to protect her from her coach's abuse." 11 Cal. 5th at 222. The California Supreme Court held that in seeking to impose an affirmative duty to protect, a plaintiff's claim must satisfy both the *Rowland*-factors and the special-relationship test. *Id.* at 213. Neither basis by itself is sufficient to impose an affirmative duty to protect. Therefore, "even when a special relationship gives rise to an affirmative duty to protect, a court must still consider whether the policy considerations set out in *Rowland* warrant a departure from that duty in the relevant category of cases." *Id.* at 222. Applying *Brown* here, plaintiffs cannot argue that a special relationship between themselves and defendants, even if one existed, imposes an affirmative duty to protect on defendants because the court has already concluded above that consideration of the *Rowland* factors does not support that conclusion.

Finally, the court will explain why defendants did not assume a duty to plaintiffs in this case. As an initial matter, their NIED claims appears foreclosed even if plaintiffs could demonstrate that defendants assumed a duty because the court concluded above that *Rowland* does not support imposing an affirmative duty to protect in this case. *Brown*, 11 Cal. 5th at 209, 218–19 (holding exceptions to the no-duty-to-protect rule must be consistent with *Rowland*). However, assuming plaintiffs' NIED claim is not foreclosed on that basis, their claim still fails as a matter of law. As noted above, a NIED claim based on an assumption of a duty can succeed only if defendants assumed a duty "in which the emotional condition" of any of the plaintiffs was the "object." *See Potter*, 6 Cal. 4th at 985; *see also Erlich v. Menezes*, 21 Cal. 4th 543, 559 (1999) (explaining NIED claims based on an assumed duty may prevail only if "emotional concerns are the essence" of the duty); *Granger v. Lowe's Home Ctrs., LLC*, No. 1:14-cv-01212-

1   DAD, 2016 WL 1138175, at *6 (E.D. Cal. Mar. 23, 2016) (same).  Plaintiffs argue that

2   defendants assumed a duty to prevent emotional harm because of the services they offered.  (*See,*

3   *e.g.*, Doc. No. 64 at 8.)  Plaintiffs essentially ask the court to impose a duty on defendants based

4   on the good Samaritan rule, also referred to as a theory of negligent undertaking.  "The

5   foundational requirement of the good Samaritan rule is that in order for liability to be imposed

6   upon the actor, he must specifically have undertaken to perform the task charged with having

7   performed negligently, for without the actual assumption of the undertaking there can be no

8   correlative duty to perform that undertaking carefully." *Artiglio v. Corning Inc.*, 18 Cal. 4th 604,

9   614–15 (1998) (citation omitted).  "[T]he scope of any duty assumed depends on the nature of the

10  undertaking." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2005).  Here, Naomi's House

11  did not "specifically" undertake the task of protecting its clients from emotional harm.  *See*

12  *Artiglio*, 18 Cal. 4th at 614–15.  Plaintiffs' general claim to the contrary, unsupported by any

13  citation to evidence, will not be accepted at face value.  (*See* Doc. No. 64 at 8 ("Defendants

14  specifically designed their facility to formulate plans to affect their clients' physical, mental and

15  *emotional well-being*." (emphasis added)).)  Plaintiffs also argue unpersuasively that defendants

16  assumed a duty to prevent clients from suffering emotional harm because Naomi's House

17  imposed rules on the behavior of its clients.  *See Delgado*, 36 Cal. 4th at 249–50 ("Merely

18  because a supermarket or other similar enterprise 'chooses to have a security program' that

19  includes provision of a roving security guard does not signify that the proprietor has assumed a

20  duty to protect invitees from third party violence." (citation omitted)).  In short, plaintiffs cannot

21  point to any evidence before the court on summary judgment indicating that defendants

22  specifically assumed the task of caring for the emotional well-being of its clients.

23      For these reasons, the court concludes that defendants did not owe plaintiffs a duty under

24  California law.  Defendants' motions for summary judgment as to the plaintiffs' NIED claims

25  will therefore be granted.

26  **C.    Negligence *Per Se***

27      Plaintiffs do not oppose the granting of summary judgment in favor of defendants as to

28  plaintiffs' negligence *per se* claims, nor do they otherwise address those claims in their

oppositions.  (*See passim* Doc. No. 64.)  A negligence per se claim has four elements:  "(1) the defendant violated a statute or regulation, (2) the violation caused the plaintiff's injury, (3) the injury resulted from the kind of occurrence the statute or regulation was designed to prevent, and (4) the plaintiff was a member of the class of persons the statute or regulation was intended to protect."  *United States v. Sierra Pac. Indus.*, 879 F. Supp. 2d 1096, 1103–04 (E.D. Cal. 2012) (quoting *Alejo v. City of Alhambra*, 75 Cal. App. 4th 1180, 1184–85 (1999)).  Here, plaintiffs cannot demonstrate there is a genuine issue of material fact as to the first element of their negligence *per se* claim.  As explained below, the court will dismiss all of plaintiffs' statutory/regulatory claims.  Further, plaintiffs have not identified any other law that may serve as the basis for their negligence per se claims.  (*See, e.g.*, DSF-Carranza at ¶ 33.)  Because plaintiffs fail to identify any "statute or regulation" that defendants may have violated, the court will dismiss their negligence *per se* claims.

**D.      Federal Housing Act**

The FHA prohibits housing discrimination and threats or intimidation on the basis of sex and other protected classes.  42 U.S.C. § 3604.  In moving for summary judgment with respect to plaintiffs' FHA claim, defendants make three arguments:  (1) Naomi's House is not a "dwelling"; (2) the alleged harassment was not "sufficiently severe or pervasive"; and (3) defendants did not "coerce, intimidate, threaten, or interfere" with plaintiffs' enjoyment of their rights.  (Doc. No. 56-1 at 24–28.)  Plaintiffs oppose summary judgment on each ground.  Below, the court will discuss defendants' first two arguments because they are dispositive of the pending motions as to plaintiffs' FHA claims.

1.      Naomi's House Is Not A "Dwelling" Under The FHA.

The FHA is intended "to provide, within constitutional limits, for fair housing throughout the United States" and is afforded a "generous construction" to further its "broad and inclusive" protections.  *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (citations omitted).  Specifically, the FHA prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of . . . sex[.]"  42 U.S.C. § 3604(b).  Under the FHA, a "dwelling" is either a building or structure "occupied as, or designed or intended for

28

occupancy as, a *residence*" or alternatively, "any vacant land" offered for sale or lease.  42 U.S.C. § 3602(b) (emphasis added); 24 C.F.R. § 100.20(b) (same); *see* 24 C.F.R. § 100.201 (defining a "dwelling unit" as including "sleeping accommodations in shelters intended for occupancy as a *residence* for homeless persons" (emphasis added)).  "Residence" is critical to the definition of "dwelling."  Although undefined by the FHA, courts have interpreted "residence" consistent with its ordinary meaning.  *See, e.g.*, *United States v. Hughes Mem'l Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975) ("a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit" (quoting Webster's Third New Int'l Dictionary)); *Jenkins v. N.Y. City Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 517–18 (S.D.N.Y. 2009) (observing that courts "continue[] to look to the *Hughes* 'plain meaning' analysis in determining what constitutes a dwelling under the FHA").

Whether a homeless shelter is a "dwelling" subject to the FHA has divided courts across the country.  *See, e.g.*, *Hunter on behalf of A.H. v. Dist. of Columbia*, 64 F. Supp. 3d 158, 174 (D.D.C. 2014) (collecting cases).  The Ninth Circuit has "never squarely addressed the issue of whether all temporary shelters fit within the . . . definition of 'dwelling'" under the FHA.  *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 n.2 (9th Cir. 2007) (noting circuit precedent in *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 942 (9th Cir. 1996), where "the parties did not dispute that the FHA applied" to a homeless shelter).  At the same time, the Ninth Circuit in *Community House* stated that it had "little trouble concluding that at least part of the" shelter was a "dwelling" because it generated "up to $125,000 in rent per year from [49] transitional housing units in which the tenants reside for up to a year and a half."  *Id.*

In *Intermountain Fair Housing Council v. Boise Rescue Mission Ministries*, the district court granted a motion for summary judgment brought on behalf of a nonprofit homeless shelter after concluding that it was not a dwelling subject to the FHA.  717 F. Supp. 2d 1101, 1109–12 (D. Idaho 2010), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011).  The district court explained that other courts had considered two factors to determine if a facility is a dwelling: "(1) whether the facility is intended or designed for occupants who intend to remain in the facility for any significant period of time; and (2) whether those occupants would view the facility as a

1   place to return to during that period." *Id.* at 1109 (quoting *Lakeside Resort Enters., LP v. Bd. of*

2   *Supervisors of Palmyra Twp.*, 455 F.3d 154, 158 (3d Cir. 2006)).  After observing that two out-

3   of-circuit district courts had reached the opposite conclusion as to whether a homeless shelter is a

4   dwelling under the FHA, the district court in *Intermountain* then summarized the case law outside

5   the context of homeless shelters.  The court noted that summer bungalows, cabins for migrant

6   workers, nursing homes, drug-and-alcohol treatment facilities, group homes for children, and

7   hospice facilities for AIDS patients were all dwellings subject to the FHA; but that city jails and

8   lodging, such as hotels and bed-and-breakfasts, did not qualify as dwellings.  *Id.* at 1111.  In

9   concluding that the homeless shelter in *Intermountain* was not a dwelling for purposes of the

10   FHA, the district court found the following facts relevant:

11   
12   guests of the shelter component are not charged a fee for staying in
     the shelter; are assigned a bed in a dormitory-style room, a hallway,
     or the day room; generally are allowed to stay for a maximum of
13   seventeen consecutive nights (except during the winter season
     months when the maximum stay is more flexible due to the danger
14   that cold weather presents to homeless individuals during the
     night); are not guaranteed that they will have the same bed each
15   night they return; with limited exceptions, are not allowed to stay at
     the shelter during the day, are required to leave the shelter every
16   morning by 8:00 a.m., and may not return, except for lunch, until
     4:00 p.m.; are not allowed to leave the shelter once they arrive in
17   the evening; generally are not allowed to stay at the shelter on a
     particular evening if they do not check in during the designated
18   hours; are not allowed to personalize the bed area assigned to them
     or leave belongings in their bed area; and, with extremely limited
19   exceptions, are not allowed to receive phone calls, mail, or have
     visitors at the shelter.

20   *Id.*; *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 969 (9th Cir. 2010) (observing

21   *Intermountain* concluded that the same homeless shelter was not a "dwelling," but declining to

22   decide the issue because qualified immunity required dismissal).[12]

23        Alternatively, plaintiffs argue that this court should follow the decision in *Woods v.*

24   *Foster*, 884 F. Supp. 1169, 1173 (N.D. Ill. 1995), which concluded—on a motion to dismiss—

25   that a homeless shelter may qualify as a dwelling under the FHA.  (*See* Doc. No. 64 at 18.)  In

26   

27   _____
     [12]  The Fourth Circuit also declined to answer whether a homeless shelter may be a dwelling
28   under the FHA.  *See Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 639 (4th Cir.
     2016).

*Woods*, the district court concluded that a homeless shelter was a dwelling because the plaintiffs in that case had "no other place to return to or reside[.]"  884 F. Supp. at 1174.  The district court in *Intermountain* distinguished *Woods* on the facts and on the law.  It first explained that the guests in *Woods* were permitted to stay at the shelter "for a much longer period of time" and up to 120 days, whereas the guests in *Intermountain* were only allowed to stay for 17 consecutive nights with some exceptions during the colder months.  655 F. Supp. 2d at 1112.  Disagreeing with the legal reasoning adopted by the court in *Woods*, the district court in *Intermountain* stated that it also was

> not convinced that a homeless shelter is a "dwelling" simply because the guests have "nowhere else to 'return to,'" . . . because, under that interpretation of "dwelling," any building or structure in which a homeless person is sleeping and storing his or her possessions would be considered a "dwelling" based simply on the intent and circumstances of the homeless person.

*Id.* (internal citations omitted); *see also Johnson v. Dixon*, 786 F. Supp. 1, 4 (D.D.C. 1991) (doubting whether an "'emergency overnight shelter,' . . . *i.e.*, a place of overnight repose and safety for persons whose only alternative is to sleep in alleys or doorways, can be characterized as a 'dwelling' within the meaning of the Act, even if it may seem like home to them").

Here, defendant Naomi's House and the homeless shelter at issue in *Intermountain* share many similarities.  Naomi's House is an "overnight" homeless shelter with 24 beds.  (DSF-Carranza at ¶ 3.)  Naomi's House does not charge clients a fee to utilize its services.  (*Id.* at ¶ 15.)  Instead, for new clients, beds at Naomi's House are assigned on a first-come, first-serve basis, "and most nights there is a lottery to stay."  (*Id.* at ¶ 5.)  Returning clients staying consecutive nights are not guaranteed the same bed or room each day.  (*Id.* at ¶ 35.)  All clients must check out of Naomi's House at 8:00 a.m. and clients wishing to return are not allowed to enter Naomi's House again until 4:30 p.m. on weekdays, 12:45 p.m. on weekends, and 5:45 p.m. on holidays.  (*Id.* at ¶ 37.)  If a returning client fails to check in at the times noted above, "her spot at Naomi's House will be given to another individual in need."  (*Id.* at ¶ 34.)  Plaintiffs are allowed to bring personal items into Naomi's House "at their own risk[,]" though it appears undisputed that they may not "claim or personalize" their assigned spaces "in any way."  (*Id.* at ¶ 36.)  Clients are not

1   allowed to bring cell phones into Naomi's House.  (*Id.* at ¶ 8.)  Further, defendants' showers "are

2   not private, but rather a locker room style building consisting of an open changing area and seven

3   individual shower stalls."  (*Id.* at ¶ 11.)  Thus, the main difference between Naomi's House and

4   the shelter in *Intermountain* is that the clients in *Intermountain* were allowed to stay for a

5   maximum of 17 consecutive nights, whereas "[t]here is no limit on the number of days a client

6   can stay at Naomi's House" so long as they check back into the shelter by the times noted above.

7   (*Id.* at ¶ 34.)  There is also one other difference.  The parties agree that, during D.N.'s stay, "the

8   longest anyone had been at Naomi's House was approximately one year *off and on*."  (PSF-

9   Carranza at ¶ 18 (emphasis added).)[13]  Accordingly, a key question for the court to resolve is

10  whether these two facts—no maximum stay and one client who stayed for a year "off and on"

11  while D.N. was present—are a sufficient basis upon which to conclude that Naomi's House is a

12  dwelling subject to the FHA.

13          The court finds that plaintiffs have not presented sufficient evidence in opposing summary

14  judgment to create a genuine issue as to whether Naomi's House is a dwelling.  As noted in

15  *Woods*, the sole case relied upon by plaintiffs, "the length of time one expects to live in a

16  particular place . . . is not the exclusive factor in determining whether the place is a residence or a

17  'dwelling.'"  884 F. Supp. at 1173.  Thus, while the length of time one expects to stay at a shelter

18
19  ---
    [13]  The parties also agree that the longest period of time that any client has ever stayed at Naomi's
    House—which occurred "prior to D.N. entering the program"—is eight years.  (PSF-Carranza at
20  ¶ 17.)  The uncontroverted evidence shows that defendants subsequently took steps "way back
    then" to ensure that "does not happen again."  (*See id.*; Kapetan Decl. at ¶ 3, Ex. 1 (Deposition of
21  Sara Mirhadi, Programs Officer of Defendants) at 61:22–25.)  Of course, "[i]t is the period the
    Shelter was intended or designed to be available to [plaintiffs] that is relevant, not the amount of
22  time the Shelter may have been available to others."  *Smith v. The Salvation Army*, No. 13-114-J,
    2015 WL 5008261, at *4 (W.D. Pa. Aug. 20, 2015) (applying the Third Circuit's test in
23  concluding that a shelter was not a dwelling under the FHA).  Still, if *similarly situated clients*
    stay at the same facility during the *same time period*—one of the groups staying for a much
24  longer period of time than the other—that might well be relevant in determining whether the
    facility was a dwelling.  *See Hughes*, 396 F. Supp. at 549 (plain meaning); *see also Lakeside*
25  *Resort*, 455 F.3d at 158 (two-factor test).  Here, because no plaintiff has presented evidence
    showing that her stay overlapped at all with the client who stayed at Naomi's House for eight
26  years, the length of that client's stay is not relevant.  (*See* PSF-Carranza at ¶ 17.)  However,
    because each plaintiff has shown that her stay overlapped, at least to some extent, with the client
27  who stayed for one non-consecutive year, the length of that client's stay is relevant to resolution
    of this issue here.  (*See id.* at ¶ 18.)
28

is relevant to the analysis, it is not dispositive.  Instead, the length of time a client may stay at a shelter is but one factor of the Third Circuit's test, which also asks whether the shelter was intended or designed for a prolonged stay and whether clients would view the shelter as a place to return during that stay.  *See Lakeside Resort*, 455 F.3d at 158.  Here, the parties agree that Naomi's House, which is a part of Poverello House, "serves the homeless" by providing "temporary shelter . . . for those *seeking and hoping to end their homelessness*."  (DSF-Carranza at ¶ 1 (emphasis added).)  Furthermore, the parties also agree that Naomi's House carries out its mission by assigning a case manager to each client who is responsible for "formulating a housing and service plan, and those plans are how to get [the client] *out of homelessness*."  (PSF-Carranza at ¶ 10 (emphasis added).)  In this regard, it appears the parties agree that Naomi's House is "a place of temporary sojourn or transient visit."  *See Hughes*, 396 F. Supp. at 549.  Stated differently and applying the first prong of the Third Circuit's rule, Naomi's House is not "intended or designed for" individuals to stay "for any significant period of time[.]"  *See Lakeside*, 455 F.3d at 158.  Additionally, plaintiffs have not presented evidence satisfying the second prong of the Third Circuit's test either.  Aside from the single client who stayed at Naomi's House "off and on" for about a year, there is no other evidence before the court on summary judgment suggesting that Naomi's House was generally "view[ed]" by its clients "as a place to return to" during their stays of "significant" length.  *See id.*  For example, plaintiffs did not submit their own declarations explaining if they viewed Naomi's House as a place "to which [they] intend[ed] to return[,]" *see Hughes*, 396 F. Supp. at 549, nor do they provide the average length clients stayed at Naomi's House more generally.  Although Naomi's House did not impose a maximum length of stay on its clients, which would seem to weigh in favor of plaintiffs on summary judgment, the practical realities of Naomi's House paint a different picture.  That plaintiffs, who have completed discovery in this case, were only able to muster just a single client who stayed at Naomi's House sporadically for about a year, actually suggests that the shelter was

/////

/////

/////

1    *not* viewed as a residence by many (if not almost all) of its clients.[14]  Applying the plain meaning

2    analysis in *Hughes* as well as the two-prong test in *Lakeside*, the court concludes that Naomi's

3    House—where the allegations giving rise to this lawsuit occurred—is not a dwelling subject to

4    the FHA.  The leading district court decision in the Ninth Circuit—*Intermountain*—supports this

5    conclusion.  Therefore, defendants' motion for summary judgment as to plaintiffs' FHA claims

6    will be granted on this basis.

7           2.     D.N.'s Alleged Harassment Was Not "Sufficiently Severe or Pervasive"

8           Summary judgment in favor of defendants on plaintiffs' FHA claims is also warranted on

9    another ground.  Some courts, including judges in this district, allow sexual harassment claims

10   brought under the FHA if the alleged harassment creates a "hostile housing environment."  *See,*

11   *e.g.*, *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013); *see also Gamble v. City*

12   *of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) (explaining that the analysis for discrimination

13   claims under Title VII applies to claims of discrimination under the FHA).  To prevail on such a

14   claim, a plaintiff must demonstrate that she was subjected to:  (i) unwelcome (ii) sexual

15   harassment (iii) that was sufficiently severe or pervasive as to deprive the plaintiff the right to

16   enjoy his or her home, and (iv) defendant knew or should have known of the harassment in

17   question but failed to take prompt remedial action.  *Salisbury*, 974 F. Supp. 2d at 1290.  Courts

18   must look to "all the circumstances" in determining if the alleged conduct was severe or

19   pervasive, including "the frequency of the discriminatory conduct; its severity; whether it is

20   physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

21   interferes with" a plaintiff's right to enjoy his or her home.  *See Harris v. Forklift Sys., Inc.*, 510

22   U.S. 17, 23 (1993).

23          The Supreme Court has explained that the "standards for judging hostility are sufficiently

24   demanding to ensure that Title VII does not become a 'general civility code.'"  *Faragher v. City*

---

26   [14]  The same logic applies with equal force even if the court were to consider relevant the other
27   client who stayed at Naomi's House for eight years.  *See supra* note 13.  Two lengthy stays—one
     occurring "off and on" and the other prompting changes at the facility to prevent such stays—
28   does not convince the court that Naomi's House is a dwelling for purposes of the FHA as that
     term has been defined under the law.

*of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).  "Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  *Id.* (citation omitted); *see also Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (finding no hostile working environment based on "isolated incidents of sexual horseplay"); *Jordan v. Clark*, 847 F.2d 1368, 1374–75 (9th Cir. 1988) (telling "off-color" jokes did not create an abusive working environment).  The Ninth Circuit has explained that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness of the conduct." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000) (citation omitted).  In other words, "the more severe harassment, the less need to show a repetitive series of incidents."  *Id.* Two relatively recent Ninth Circuit decisions help clarify the line between sufficient and insufficient conduct to prevail on such a claim under Title VII.  In *Westendorf v. West Coast Contractors of Nevada, Incorporated*, the Ninth Circuit affirmed the district court's grant of summary judgment in favor of the employer on a work-place discrimination claim brought under Title VII after concluding that four "crude and offensive remarks," including comments about breast sizes, tampons and orgasms, and gender-based stereotypes, were not "sufficiently severe or pervasive" for the plaintiff to demonstrate that she was "subject . . . to an abusive environment." 712 F.3d 417, 422 (9th Cir. 2013).  Conversely, in *E.E.O.C. v. Prospect Airport Services, Incorporated*, the Ninth Circuit reversed the dismissal of a work-place discrimination claim brought under Title VII.  621 F.3d 991, 1000 (9th Cir. 2010).  There, an employee, Ms. Munoz, made several sexual advances towards another employee, Mr. Lamas.  Ms. Munoz "propositioned him for sex[,]" "wrote to him that she dreamed of him in a bath, that she gave good 'body wash,' and that she wanted him 'sexually.'"  *Id.* at 997.  But it didn't stop there.  Ms. Munoz "performed gestures simulating fellatio, and give him a photograph of herself emphasizing her breasts and possibly without clothes on."  *Id.*  "After she recruited coworkers to pressure [Mr.] Lamas, they mocked him by suggesting that he was homosexual."  *Id.*  Simply put, Ms. "Munoz's pursuit of [Mr.] Lamas was relentless."  *Id.* at 1000.  Mr. Lamas "described over six months of constant (and often daily) sexual pressure and humiliation" at his workplace.  *Id.*  Based on these facts, the

1  Ninth Circuit concluded that genuine issues of material fact precluded summary judgment and

2  reversed the district court's dismissal of Mr. Lamas' claim.

3        In Title VII cases, the Supreme Court has directed courts to give proper consideration to

4  the circumstances in which the allegations of discrimination arise.  More specifically, the inquiry

5  in harassment cases "requires careful consideration of the social context in which particular

6  behavior occurs and is experienced by its target."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523

7  U.S. 75, 81 (1998).  As the Supreme Court has explained:

8
9
> A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.  Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

10
11
12
13
14

15  *Id.* at 81–82.

16        Construing the evidence presented on summary judgment here in the light most favorable

17  to plaintiffs, the court concludes that there is no genuine issue as to whether D.N.'s conduct was

18  "sufficiently severe or hostile" as to deprive plaintiffs of their right to enjoy the services offered

19  by Naomi's House.

20        The court will begin with the more straightforward analysis first.  It is undisputed that

21  plaintiffs Carranza and Wade never complained that D.N. ever harassed them in any manner,

22  aside from D.N.'s mere presence in Naomi's House.  In her first complaint, plaintiff Carranza

23  simply reported that she had a problem showering with D.N.  (DSF-Carranza at ¶ 25.)  The

24  second complaint, initiated by a staff member, followed an incident where plaintiff Carranza

25  yelled at D.N. for using the shower.  (*Id.* at ¶ 26.)  Indeed, plaintiff Carranza was reminded by

26  Naomi's House not to yell at others.  (*Id.*)  The parties agree that D.N. never made any "sexual

27  advances towards" plaintiff Carranza and D.N. never touched her "in a manner she considered

28  offensive or harassing."  (*Id.* at ¶¶ 38–39.)  On the other hand, plaintiff Wade never made any

1   complaint about D.N. whatsoever.  (DSF-Wade at ¶ 25.)  She claims she did not do so because

2   she was in fear that she would be kicked out of Naomi's House, but she provides no evidentiary

3   support for this conclusory claim, such as any evidence indicating that other clients who

4   complained of D.N.'s behavior "end[ed] up on the street."  (*See id.*)  Still, plaintiff Wade never

5   claimed in her deposition testimony that she was harassed directly by D.N.  Further, it is

6   undisputed that D.N. never touched plaintiff Wade "in a manner she considered offensive or

7   harassing."  (*Id.* at ¶ 34.)  The circumstances surrounding the alleged sexual harassment directed

8   at plaintiffs Carranza and Wade, viewed in a light most favorable to them, do not even rise to the

9   level of "sporadic use of abusive language, gender-related jokes, and occasional teasing"—which

10  is, to be sure, insufficient to prevail on a sexual harassment claim brought under Title VII.  *See*

11  *Faragher*, 524 U.S. at 788 (citation omitted).  Neither plaintiffs Carranza nor Wade oppose

12  summary judgment with any evidence from which a jury could reasonably infer that they were

13  subjected to "sufficiently severe and pervasive" sexual harassment.  *See Westendorf*, 712 F.3d at

14  422.  Therefore, defendants' motion for summary judgment with respect to the FHA claims

15  brought by plaintiffs Carranza and Wade will be granted.

16      The evidence presented by plaintiff Stroud and McGee in opposing summary judgment as

17  to their FHA claims presents a closer call but is ultimately insufficient to prevail on those claims

18  as well, even viewing the evidence in a light most favorable to them.  As an initial matter, the

19  court must consider Naomi's House's "social context" in determining whether D.N.'s alleged

20  harassment rose to the level of being "sufficiently severe and pervasive" so as to deprive plaintiffs

21  of their right to enjoy the services offered by the shelter.  *See Oncale*, 523 U.S. at 81.  It is

22  undisputed that Naomi's House is a shelter intended to serve "hard-to-reach homeless persons

23  with severe mental illness who are typically unable or too unwell to participate in other housing

24  or supportive services[.]"  (DSF-Carranza at ¶ 4.)  For its clients, Naomi's House is not a place of

25  employment as is the case in many of the sexual-harassment cases.  *See, e.g.*, *Manatt v. Bank of*

26  *America, NA*, 339 F.3d 792, 794–95 (9th Cir. 2003) (financier at a large national bank); *Nichols v.*

27  *Azteca Rest. Enters., Inc.*, 356 F.3d 864, 870 (9th Cir. 2001) (restaurant host); *Anderson v. Reno*,

28  190 F.3d 930, 932 (9th Cir. 1999) (Federal Bureau of Investigation agent), *abrogated on other*

1     grounds, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Draper v. Coeur*

2     *Rochester, Inc.*, 147 F.3d 1104, 1105 (9th Cir. 1998) (mining company employee).  Instead, the

3     parties agree that Naomi's House is a place of refuge for individuals who are facing some of the

4     most significant hardships life has to offer.  Moreover, the facts here are not similar to the typical

5     sexual-harassment case brought in the housing context, where the allegations usually focus on the

6     statements and conduct of a property manager or landlord—not another tenant who lives in the

7     same unit as the victim.  *See, e.g.*, *Salisbury*, 974 F. Supp. 2d at 1284 (involving a resident of a

8     mobile home park allegedly harassed by property managers); *Macias v. Lange*, No. 14cv2763-

9     GPC(JMA), 2016 WL 1274762, at *2 (S.D. Cal. Apr. 1, 2016) (involving a landlord making

10    unannounced visits to units and requiring in-person rent payments to facilitate harassment);

11    *Sharon v. New Directions Inc.*, No. 2:15–cv–04239–SVW–E, 2016 WL 158223, at *1–2 (C.D.

12    Cal. Jan. 12, 2016) (involving a veteran suffering from PTSD residing at a supportive housing

13    facility for veterans who was harassed by property manager and security guard).  In contrast, D.N.

14    was not a property manager or landlord for Naomi's House, but was a guest at the shelter from

15    June 2017 to April 2018.  (DSF-Carranza at ¶ 18.)

16          In light of the above, it is not entirely clear where the court should set the threshold for

17    "sufficiently severe and pervasive" harassment in the context of this case, which involves a

18    shelter for women in need, some of whom are suffering from and living with mental health issues.

19    At the same time, unlike in many employment and housing harassment cases, the individual who

20    allegedly harassed the plaintiffs in this case can in no way be considered an agent of defendants.

21    The facts of this case must be considered in this unique context.  In doing so, and viewing the

22    evidence presented on summary judgment in the light most favorable to plaintiffs Stroud and

23    McGee, the evidence does not support the conclusion that they were subject to a "sufficiently

24    severe and pervasive" hostile-housing environment at Naomi's House.

25          Beginning with plaintiff Stroud, she reported on June 7, 2017 that D.N. said the two could

26    be together after they left Naomi's House.  (DSF-Stroud at ¶ 27.)  On June 16, 2017, plaintiff

27    Stroud reported that D.N. made a sexual comment of an unspecified nature and showed plaintiff a

28    picture of D.N. wearing a bra and "with her 'private tucked'" between her legs.  (*Id.* at ¶ 28.)  It is

1  undisputed that D.N. never touched plaintiff Stroud "in a manner she considered offensive or

2  harassing." (*Id.* at ¶ 39.)  Thus, plaintiff Stroud's allegations are confined to a period of

3  approximately one week.  Because these incidents were not pervasive, they must therefore have

4  been egregious for plaintiff to maintain her claim.  *See Brooks*, 229 F.3d at 926 (explaining

5  severity is inversely related to pervasiveness for a sufficient showing under Title VII).  Even

6  viewing the evidence in the light most favorable to plaintiff Stroud, these two incidents upon

7  which her claim is based are not sufficiently severe.  Propositioning another individual in a non-

8  sexual manner to be in a relationship sometime in the future and showing that individual a picture

9  of a sexual nature about a week later is, at most, two "isolated incidents of sexual horseplay."  *See*

10  *Candelore*, 975 F.2d at 590; *see also Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027,

11  1034 (9th Cir. 2005) ("Simple teasing, offhand comments, and isolated incidents (unless

12  extremely serious) will not amount to discriminatory changes in the terms and conditions of

13  employment." (internal quotation marks omitted)).  This result does not change even if the court

14  assumes the picture D.N. showed plaintiff Stroud involved nudity.[15]  Most courts have held that a

15  single sexual picture, including one depicting pornography, is insufficient to maintain a Title VII

16  claim.  *See, e.g.*, *Alioto v. Associated Exch. Inc.*, 482 Fed. App'x 222, 223 (9th Cir. 2012)

17  (affirming no finding of a hostile working environment because, in part, "[t]here was no evidence

18  of widespread pornography" and the employer took corrective action after a coworker showed the

19  plaintiff a single "pornographic picture").[16]  And courts have held that multiple pictures of a

20  sexual nature, including ones with nudity, are also insufficient to maintain a viable Title VII

21  claim.  *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 315, 319 (2d Cir. 1999) (finding

22  no hostile working environment where allegations included seven pictures of semi-clothed or

23

24  [15]   Although plaintiff Stroud never asserted the pictures involved nudity, the court must construe
this fact in a light most favorable to plaintiff.  (*See* Doc. Nos. 57-6 (Declaration of Sara Mirhadi
25  for Plaintiff Stroud) at ¶ 22, Ex. L; 57-8 at 89 (Copy of Complaint Filed by Plaintiff Stroud)
(making no mention of nudity); 57-4 (Declaration of Cynthia Lawrence for Plaintiff Stroud) at ¶
26  8, Ex. U; 57-10 at 52–53 (Deposition Transcript for Plaintiff Stroud: same).)

27

28  [16]   Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
36-3(b).

1    nude men posted in the workplace, and one instance of "lewd banter" where the plaintiff heard

2    one co-worker ask another "do you want to do it now?" while "point[ing] at his crotch").  While

3    D.N.'s behavior may have been inappropriate, even viewing the evidence in a light most

4    favorable to plaintiff Stroud, it did not rise to the level sufficient to prevail on a sexual-

5    harassment claim.  No reasonable jury could conclude under the law as it exists that D.N.'s

6    conduct was "sufficiently severe and pervasive" as to deprive plaintiff of the right to use the

7    services at Naomi's House.  Therefore, defendants' motion for summary judgement will be

8    granted as to plaintiff Stroud's FHA claim as well.

9         Plaintiff McGee's allegations and evidence present the closest call on summary judgment

10   in the court's view because she registered the most complaints about D.N.'s behavior.  On June

11   18, 2017, plaintiff McGee made the following complaints:  D.N. said she had a "sexting session"

12   earlier with an unspecified person and had "69 orgasms"; D.N. said she was a lesbian and wanted

13   to "suck a man dry"; and D.N. showed pictures of sexually-posed women on her phone.  (DSF-

14   McGee at ¶ 25.)  After making that complaint, and aside from complaints about it being unfair to

15   be required to shower with D.N.,[17] plaintiff McGee did not make another complaint alleging

16   harassment until 10 months later.  (*See id.* at ¶¶ 26, 28–29.)  On April 5, 2018, plaintiff McGee

17   complained that D.N. said that plaintiff's breasts become larger when she is stressed and smaller

18   when not stressed.  (*Id.* at ¶ 30.)  The same day, plaintiff McGee also reported D.N.'s

19   inappropriate treatment of another client—named "L" and who is not a party to this action.  (*Id.*)

20   After "L" formally complained, Naomi's House expelled D.N. for the night.  (*Id.*)  The parties

21   have not described "L"'s allegations in detail in connection with the pending motion.  However,

22   based on the court's review of the evidence before it on summary judgment, it appears the

23   allegations against "L" are as follows:  D.N. started "gravitating" towards "L"; D.N. peered into

24   "L"'s room; D.N. exposed her genitals to "L" when the two were shopping at Walmart; and D.N.

25   showed "L" a YouTube video of her shaving her legs and "rubbing [her]self" in an unspecified

26   manner.  (PSF-McGee at ¶¶ 40–42.)  The parties agree that D.N. never touched plaintiff McGee

27   _____

[17]  As discussed above, Naomi's House addressed these complaints by separating plaintiff Stroud
28   and D.N. into different shower groups.

1   "in a manner she considered offensive or harassing" and plaintiff McGee "never saw D.N. touch

2   anyone."  (DSF-McGee at ¶¶ 41–42.)

3          Here, although it is a closer question than with the other plaintiffs, the court concludes that

4   plaintiff McGee's allegations, viewed in a light most favorable to her, do not rise to the level of

5   being "sufficiently severe and pervasive" so as to deprive her of the right to enjoy the services

6   offered by Naomi's House.  The relevant allegations of harassment occurred on two separate

7   occasions ten months apart:  the first occurred on June 18, 2017 and alleged that D.N. harassed

8   plaintiff McGee in several ways; and the second occurred on April 5, 2018 and alleged that D.N.

9   made one inappropriate comment to plaintiff McGee but also reported that D.N. was harassing

10  another client of Naomi's House who is not a party to this lawsuit.  First, D.N.'s comments about

11  her desire to perform oral sex on a man and experiencing orgasms are not severe.  Crucially, they

12  were not directed at plaintiff McGee and involved no touching whatsoever.  *See Westendorf*, 712

13  F.3d at 419 (asking employee about her experience with orgasms, in combination with other

14  allegations, is not actionable, particularly given that the harassment "was not physical").  Second,

15  for purposes of the pending motion, the court will construe D.N.'s comment about plaintiff

16  McGee's breast size as being more demeaning than other comments made by D.N to the other

17  plaintiffs in this litigation.  Ultimately, however, that single comment, which occurred over a year

18  after plaintiff's initial complaint, was not particularly severe either.  *See id.* at 419 (asking

19  plaintiff if she was intimidated by another woman's breast size is not severe enough to state a

20  potentially meritorious claim even in combination with other sexual remarks).

21         D.N. did show plaintiff McGee several sexually-charged pictures.  Again, although

22  plaintiff McGee never explicitly asserted these pictures involved nudity, the court must view this

23  evidence in the light most favorable to her.  (*See* Doc. Nos. 56-6 (Declaration of Sara Mirhadi for

24  Plaintiff McGee) at ¶ 19, Ex. J; 56-8 at 85 (Copy of Complaint Filed by Plaintiff McGee: making

25  no mention of nudity).)  Nonetheless, as noted above, the display of a few sexual pictures—

26  including ones with nudity—is not a sufficient basis upon which to maintain a claim under Title

27  VII even with some other allegations of sexual discrimination.  *See Brennan*, 192 F.3d at 315,

28  319; *see also Lipsett v. University of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988) (finding a

1   hostile working environment due to an onslaught of sexual harassment involving, among other

2   things, employees posting numerous sexually-explicit pictures or drawings in the workplace,

3   including explicit drawings of the plaintiff's body and lists of sexually charged and vulgar

4   nicknames of plaintiff and other female employees).  Plaintiff McGee's allegation is that D.N.

5   showed her sexually-charged pictures—with little details provided—on just one occasion.  After

6   the first reported complaint, there is no evidence that D.N. engaged in this type of behavior again.

7   *See Alioto*, 482 Fed. App'x at 223 (finding that persuasive "corrective action" was taken after a

8   pornographic picture was shown on one occasion).  Under existing law, D.N.'s conduct did not

9   rise to the level of being actionable under Title VII, even viewing the allegations in a light most

10   favorable to plaintiff McGee.

11       Finally, the allegations surrounding "L" do not save plaintiff McGee's sexual harassment

12   claim.  As a threshold matter, the court observes that while plaintiff McGee complained on behalf

13   of "L," it remains unclear exactly what plaintiff McGee knew about D.N.'s conduct toward "L"

14   because the parties do not provide many details in this regard in connection with the pending

15   motions.  (*See* PSF-McGee at ¶ 30 ("Plaintiff . . . made allegations about D.N. was allegedly

16   treating" "L.").)  Still, even if plaintiff McGee had full knowledge of the allegations surrounding

17   D.N.'s alleged harassment directed at "L," some of those allegations are vague and some provide

18   limited support to plaintiff McGee's own claim.  For example, the court is unaware of any

19   decision finding that an individual "gravitating" towards another, without any other details, is

20   inappropriate, let alone actionable harassment.  Further, an allegation of one client "peering" into

21   another client's room inside of a homeless shelter, where clients sleep and shower in close

22   proximity to one another, is at best vague.  So too is the allegation that D.N. showed a video of

23   her shaving her legs and rubbing herself in an unspecified manner.  But even viewing the two

24   allegations in a light most favorable to plaintiff McGee that these two incidents constituted

25   harassment, they are not egregious enough to demonstrate a "sufficiently severe and pervasive"

26   hostile-housing environment under the case law.  Regarding the most problematic of

27   allegations—D.N. exposing her genitals to "L"—the parties agree that this incident occurred not

28   at Naomi's House but at a Walmart store.  (PSF-McGee at ¶ 41.)  As a result, the legal relevance

of this incident is questionable.  Some courts have held that conduct occurring away from the workplace has limited legal relevance in Title VII cases.  *See Candelore*, 975 F.2d at 590.  Other courts have held that such conduct is relevant "when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace . . ."  *Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, 3 Fed. App'x 302, 311 (6th Cir. 2001); *see also Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991).  Naomi's House did not require any of the plaintiffs to be in close proximity to D.N.  (*See* DSF-Carranza at ¶ 14 ("Any individual utilizing the services provided by Defendants are free to accept or reject those services at any time.").  Thus, the same logic that makes harassment outside the workplace relevant in employment cases under Title VII, does not appear to apply with equal force in this case concerning a nonprofit homeless shelter operating entirely for the benefit of its clients who incur no cost whatsoever in using the services offered.  (*See id.* at ¶ 15.)  Moreover, in instances where harassment occurring outside the workplace is relevant, the harassment at issue was directed at the plaintiff, not a nonparty to the litigation.  *See Duggins ex rel. Duggins*, 3 Fed. App'x at 304–05; *Ellison*, 924 F.2d at 874.  The Walmart incident, though problematic, was not directed at plaintiff McGee.  Although the court finds it somewhat relevant to her hostile-housing-environment claim, it must still be assessed in light of D.N.'s harassment directed at plaintiff McGee specifically.

Viewing the evidence in a light most favorable to plaintiff McGee and considering all of her allegations and evidence together—two incidents (one of which included several complaints) occurring almost a year apart and harassment directed at "L"—the court concludes that D.N.'s sexual harassment was not "sufficiently severe or pervasive" to maintain a hostile-housing environment claim.  Plaintiff McGee does not cite any decision holding that allegations similar to hers—taking place in any sort of setting—are actionable under Title VII, the FHA, or any other federal law.  (*See passim* Doc. No. 64 at 18–19.)  Accordingly, defendants' motion for summary judgment with respect to plaintiff McGee's FHA claim will also be granted.

For the reasons explained above, summary judgment in favor of defendants as to plaintiffs' FHA claims is warranted on two separate grounds.  First, Naomi's House, which is where the conduct giving rise to this litigation occurred, is not a "dwelling" under the FHA.

43

1    Second, assuming Naomi's House was a "dwelling," each plaintiff has failed to oppose summary

2    judgment by coming forward with evidence upon which a jury could reasonably conclude that she

3    was subjected to "sufficiently severe and pervasive" sexual harassment at Naomi's House.

4    Therefore, defendants' motions for summary judgment as to all FHA claims will also be granted

5    on both of these independent grounds.

6    **E.    Fair Housing and Employment Act**

7         The analysis for sexual harassment claims brought under California's FEHA "mirror[s]

8    the elements and analysis under the FHA and under Title VII." *Salisbury*, 974 F. Supp. 2d at

9    1293.  Thus, to prevail on a FEHA claim based on sexual harassment in the housing context, one

10   element the plaintiff must prove is "that the harassment complained of was sufficiently severe or

11   pervasive so as to alter or interfere unreasonably with the condition of the housing arrangement . .

12   . ." *Brown v. Smith*, 55 Cal. App. 4th 767, 783 (1997).  Defendants argue that because plaintiffs

13   cannot maintain a claim under the FHA, their FEHA claims must also be rejected.  (Doc. No. 56-

14   1 at 28–29.)  Plaintiffs incorporate their arguments as to their FHA claim into the section of their

15   opposition addressing the FEHA claim, and do not provide any additional arguments or evidence

16   in opposing summary judgment on the FEHA claim.  (*See* Doc. Nos. 63–66 at 20.)  Because the

17   court has concluded above that D.N.'s conduct did not rise to the level of being "sufficiently

18   severe and pervasive" for any plaintiffs to prevail on their FHA claims, summary judgment in

19   favor of defendants as to all of the plaintiffs FEHA claims is warranted as well.

20   **F.    Intrusion into Private Affairs**

21        A claim of intrusion into private affairs has two elements:  (1) "the defendant must

22   intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable

23   expectation of privacy"; and (2) "the intrusion must occur in a manner highly offensive to a

24   reasonable person." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).  With respect to

25   the first element, "the defendant must have 'penetrated some zone of physical or sensory privacy

26   . . .' in violation of the law or social norms." *Id.* (quoting *Shulman v. Grp. W Prods., Inc.*, 18

27   Cal. 4th 200, 232 (1998)).  A plaintiff's "expectation of privacy must be 'objectively

28   reasonable.'" *Id.* (citation omitted).  The second element of an intrusion claim "essentially

1   involves a 'policy' determination as to whether the alleged intrusion is 'highly offensive' under

2   the particular circumstances." *Id.* at 287 (citation omitted).  "Relevant factors include the degree

3   and setting of the intrusion, and the intruder's motives and objectives." *Id.*  There is no bright-

4   line rule defining "highly offensive" intrusions.  *Id.*  Instead, "each case must be taken on its

5   facts."  *Id.* (quoting *Shulman*, 18 Cal. 4th at 237).

6          Here, defendants argue that plaintiffs cannot demonstrate there is a genuine issue of

7   material fact with respect to their claim for intrusion into private affairs.  (Doc. No. 56-1 at 29.)

8   The court agrees.  The entire crux of the instant litigation is that D.N. purportedly intruded the

9   privacy of plaintiffs.  (*See, e.g.*, Compl. at ¶¶ 22 ("D.N. was allowed to shower with Plaintiffs."),

10  39 ("Defendants intruded and/or allowed D.N. to intentionally intrude into Plaintiffs['] zone of

11  privacy.").  There is no evidence before the court on summary judgment suggesting that

12  *defendants* (not D.N.) invaded plaintiffs' reasonable expectations of privacy.  To the extent

13  plaintiffs attempt to rely on a theory that defendants "allowed D.N. to intentionally intrude" into

14  their privacy—as alleged in their complaint—that theory fails for a simple reason.  A claim for

15  intrusion requires the "defendant [to] intentionally intrude" a plaintiff's privacy.  *See Hernandez*,

16  47 Cal. 4th at 286.  However, D.N. is not a named defendant in this litigation and it is thus

17  unnecessary for the court to decide whether D.N. invaded plaintiffs' privacy.  Nor does the

18  complaint assert any aiding-and-abetting theory pursuant to which liability could be imposed on

19  defendants with respect to this claim.  Indeed, plaintiffs do not oppose the granting of defendants'

20  motion for summary judgment on their claims for intrusion into private affairs.  (*See passim* Doc.

21  Nos. 63–66.)  Accordingly, the court will grant defendants' motion for summary judgment as to

22  the intrusion claim on the basis that plaintiffs have failed to come forward with any evidence

23  demonstrating that defendants may be held liable with respect to that claim.

24  **G.    Punitive Damages**

25          Because the court will grant the motions to summary judgment in favor of defendants as

26  to all of plaintiffs' remaining claims, it need not address if the evidence supports a claim for

27  punitive damages under the FHA or California law.

28  /////

**CONCLUSION**

For all of the reasons explained above:

1.     Defendants' motion for summary judgment as to plaintiff Carranza (Doc. No. 55) is granted in its entirety;

2.     Defendants' motion for summary judgment as to plaintiff McGee (Doc. No. 56) is granted in its entirety;

3.     Defendant's motion for summary judgment as to plaintiff Stroud (Doc. No. 57) is granted in its entirety;

4.     Defendant's motion for summary judgment as to plaintiff Wade (Doc. No. 58) is granted in its entirety; and

5.     The Clerk of the Court is directed to assign a District Judge to this case for purposes of closing this case and, upon doing so, to enter judgment in favor of defendants and close this case.

IT IS SO ORDERED.

Dated:   **August 12, 2021**                                            _Dale A. Drozd_
                                                                UNITED STATES DISTRICT JUDGE

46